**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| NAVIN BAROT, | : | No. 4:14-CV-00673 |
| | : | |
| Plaintiff, | : | (Judge Brann) |
| | : | |
| v. | : | |
| | : | |
| SUSQUEHANNA PHYSICIAN | : | |
| SERVICES d/b/a SUSQUEHANNA | : | |
| HEALTH MEDICAL GROUP, | : | |
| DIVINE PROVIDENCE HOSPITAL OF | : | |
| THE SISTERS OF CHRISTIAN | : | |
| CHARITY, SUSQUEHANNA HEALTH | : | |
| SYSTEM, and SUSQUEHANNA | : | |
| PHYSICIAN SERVICES, | : | |
| | : | |
| Defendants. | : | |

**MEMORANDUM OPINION**

**JANUARY 9, 2018**

Plaintiff Navin Barot and Defendants Susquehanna Physician Services d/b/a

Susquehanna Health Medical Group, Divine Providence Hospital of the Sisters of

Christian Charity, Susquehanna Health System, and Susquehanna Physician

Services ("Defendants") have filed cross-motions for summary judgment on Count

V of Plaintiff's Complaint. For the reasons discussed below, Defendants' Motion

is granted, and Plaintiff's Motion is denied.

# I. INTRODUCTION

Plaintiff Navin Barot ("Dr. Barot") commenced this action on April 8, 2014 against Defendants.[1]  In his Complaint, Mr. Barot alleged five claims: (1) racial discrimination and harassment under Title VII of the Civil Rights Act of 1964 ("Title VII"); (2) wrongful/constructive termination under Title VII; (3) violations under the Pennsylvania Human Relations Act; (4) race and national origin discrimination under 42 U.S.C. § 1981; and (5) breach of contract.[2]  Defendants filed an Answer to this Complaint on June 6, 2014, and the parties thereafter commenced factual discovery.[3]

At the conclusion of discovery, and following my resolution of a motion to compel,[4] the parties filed a Joint Stipulation of Dismissal with Prejudice of Counts I, II, III, and IV.[5]  On January 31, 2017, the parties filed cross motions for summary judgment on Count V within Dr. Barot's Complaint—breach of contract.[6]  Extensive briefing on these motions followed, bringing the case to its present posture.[7]

---

[1]   ECF No. 1.

[2]   *Id.*

[3]   ECF Nos. 8 & 13.

[4]   ECF No. 51.

[5]   ECF No. 56.

[6]   ECF Nos. 61 & 64.

[7]   ECF Nos. 63, 74, 80, 85, 86, & 92.

## II.    FACTUAL BACKGROUND[8]

### A.    The Parties

Susquehanna Physician Services ("SPS") d/b/a Susquehanna Health Medical Group ("SHMG") (collectively "SPS/SHMG") is a 501(c)(3) non-profit corporation that employs physicians to work within Susquehanna Health System ("SHS").[9]  Divine Providence Hospital of the Sisters of Christian Charity ("DPH") is a non-profit corporation whose sole member is SHS.[10]  In 2009, SPS/SHMG started its own gastroenterology practice, and intended to hire two gastroenterologists to work in that practice.[11]  Jim Turri ("Mr. Turri"), Senior Vice President and COO of SPS/SHMG, recruited Plaintiff Navin Barot, M.D. as the first gastroenterologist.[12]  Dr. Barot was thereafter employed as a gastroenterologist for SPS/SHMG from July 27, 2009 through May 15, 2011.[13]  That term of employment and its eventual termination is the impetus of this litigation.

---

[8]    The relevant facts are taken from the Defendant's Statement of Material Facts, (ECF No. 65), the Plaintiff's Response to Defendants' Statement of Material Facts, (ECF No. 87), and both parties' corresponding evidentiary exhibits. Any facts that remain in dispute are noted as such.

[9]    Defs.' Statement of Undisputed Material Facts ("Defs.' SUMF") ¶¶ 2, 4; Pl.'s Resp. to Defs.' SUMF ("Pl.'s Resp.") ¶¶ 2, 4.

[10]    Defs.' SUMF ¶ 3; Pl.'s Resp. ¶ 3.

[11]    Defs.' SUMF ¶ 5; Pl.'s Resp. ¶ 5.

[12]    Defs.' SUMF ¶ 6; Pl.'s Resp. ¶ 6.

[13]    Defs.' SUMF ¶ 1; Pl.'s Resp. ¶ 1.

### B. Susquehanna Health Medical Group Physician Employment Agreement

Dr. Barot's employment as a gastroenterologist was governed by the terms of the Susquehanna Health Medical Group Physician Employment Agreement ("Physician Employment Agreement") entered into by the parties on May 18, 2009.[14] This Employment Agreement provided for a five-year term with a base salary of $560,593 for the first three years.[15] The Physician Employment Agreement also provided Dr. Barot with an opportunity to earn additional incentive compensation. The "Incentive Compensation" provision read in pertinent part:

> 6. <u>Incentive Compensation</u>
> In order to promote the efficient operation of the Physician's medical practice and the availability and provision of high quality medical service to the community served by SHMG, Physician shall be eligible to participate in an incentive compensation program in the first three years of the Agreement. If Physician WRVU's at the end of the contract year exceed 10,000 WRVU's, physician shall receive Additional Compensation, **subject to the limitations set forth in Section 7 below . . .** [16]

Section 7, or the "Limitation on Compensation" provision read as follows:

> 7. <u>Limitation on Compensation</u>
> The total amount of Base Salary plus Incentive and Quality Bonus Compensation payable by SHMG to Physician in any year of this Agreement shall not exceed the 90th percentile of the most recently available comparable Compensation Survey published by the Medical

---

[14]  Defs.' SUMF ¶¶ 8–9; Pl.'s Resp. ¶¶ 8–9.

[15]  Physician Employment Agreement (ECF No. 65-3), Exh. 2-C, at ¶¶ 1, 4A.

[16]  *Id.* ¶ 6 (emphasis added).

Group Management Association for physicians in the same specialty as Physician. If Physician's productivity, expertise and overall job performance suggests that his compensation should exceed the 90th percentile compensation limitation set forth herein, it will be presented to the Compensation Committee of the SHMG Board of Directors for consideration and determination in accordance with SHMG policy and procedure. However, Physician's total compensation shall not exceed such amount as would constitute reasonable compensation when paid by an organization, such as SHMG, which is a tax-exempt organization under Section 50l(c)(3) of the Code.[17]

The Employment Agreement also dictated that SPS/SHMG was to provide Dr. Barot with both "the opportunity to attend continuing medical education programs for a maximum of ten (10) business days annually,"[18] and the opportunity "to jointly participate in the interview, selection, and performance appraisal of all such support personnel."[19]

A "Termination" provision within Section 19 of the Employment Agreement provides for three circumstances in which termination is permitted. First, this Section allows for termination at will following a ninety (90) day advance written notice.[20] Second, the Physician Employment Agreement would automatically terminate at the discretion of SHMG if one of eleven (11) events were to occur.[21] Third, and perhaps most relevant to the instant dispute, "[e]ither party may

---

[17] *Id.* ¶ 7.

[18] *Id.* ¶ 11.

[19] Id ¶ 13, at 8 (emphasis added).

[20] *Id.* ¶ 19.

[21] *Id.*

terminate this Agreement for material breach of the Agreement by the other party or a failure to fulfill the material terms of this Agreement."[22]  In the event of such a breach, this Section further provides that:

> The non-breaching party shall give the breaching party written notice specifying the default along with notice to terminate within thirty (30) days. The breaching party shall have thirty (30) days within which to cure the default. If such default is not cured within that time, this Agreement shall terminate.[23]

Finally, the Physician Employment Agreement contains an integration clause, titled "Entire Agreement" which provides that:

> This Agreement represents the entire Agreement between the parties and supersedes all previous written or verbal understandings.[24]

### C. Susquehanna Health System Medical Director of the Gastroenterology Program Agreement

Prior to Dr. Barot commencing his employment with Defendants, he also entered into a separate contract with SHS to serve as Medical Director of Divine Providence Hospital, or DPH.[25]  Titled "Susquehanna Health System Medical Director of the Gastroenterology Program" ("Medical Director Contract"), this contract provided that Dr. Barot was responsible for fifteen (15) administrative

---

[22] *Id.*

[23] *Id.*

[24] *Id.* ¶ 26.

[25] Defs.' SUMF ¶ 10; Pl.'s Resp. ¶ 10.

duties detailed within the agreement.[26]  Compensation for performing these duties

was set at "the all-inclusive hourly rate of $100.00 per hour, to a maximum of

$50,000 per year," as verified by a monthly time log "describing with particularity

the date, nature and duration of services provided under this Agreement."[27]

Pertinent to the instant dispute, a termination provision within the Medical Director

Contract stipulated that it shall be terminable "at will by either party upon services

of written notification of intent to terminate not fewer than ninety (90) days prior

to the effective date of termination."[28]

### D.     Dr. Barot's Employment History with Defendants

Dr. Barot began his employment as a gastroenterologist and Medical

Director of Gastroenterology on July 27, 2009, and, throughout the period of his

employment, was subject to various practice reviews.[29]  During one of those

practice reviews, held on April 13, 2010, Mr. Turri explained the process,

contained within Section 7 of the Physician Employment Agreement, which would

be followed in seeking approval from the Compensation Committee for

Compensation in excess of the 90th percentile.[30]  He further discussed that there

---

[26]   Susquehanna Health System Medical Director of the Gastroenterology Program Agreement
(ECF No. 66-1), Exh. 4-A.

[27]   *Id.*

[28]   *Id.*

[29]   Defs.' SUMF ¶ 55, at 11; Pl.'s Resp. ¶ 55, at 9.

[30]   Defs.' SUMF ¶ 61, at 12; Pl.'s Resp. ¶ 61, at 10. *See also* Dep. of Jim Turri (ECF No. 65-3),
Exh. 2-E, April 12, 2010 Practice Review. While Dr. Barot contests that this process as

could be an issue with the compensation Dr. Barot was seeking for conscious sedation because there is no reimbursement from the insurance payers.[31]

In a letter dated May 17, 2010, Steven Johnson, CEO of Susquehanna Health System, wrote a letter to Dr. Barot expressing that SPS/SHMG would perform a financial analysis at the end of the contract year and "if physician productivity, expertise and overall job performance suggests that his compensation should exceed the 90th percentile compensation limitations set fort(sic) herein, it will be presented to the Compensation Committee."[32]  Thereafter, at a June 8, 2010 practice review meeting, doubt was again expressed by Mr. Turri through Brian Buttorff, Administrative Director for SPS/SHMG, as to whether the Compensation Committee would approve RVU[33] credit for conscious sedation coding bundled into another provedure.[34]

---

described by Mr. Turri was improper, he does not dispute the authenticity of this memo sent. Pl.'s Resp. ¶ 61, at 10.

[31]   Defs.' SUMF ¶ 62, at 12; Pl.'s Resp. ¶ 62, at 11.

[32]   Defs.' SUMF ¶ 67, at 13; Pl.'s Resp. ¶ 67, at 12.

[33]   "An RVU is the unit that Medicare uses to calculate the reimbursement for a particular CPT code. There are three parts to an RVU. There is a medical malpractice piece, there is a work piece and then a practice expense piece. Those three pieces added together equal the total RVU which is then multiplied times the current conversion factor, Medicare conversion factor, to determine the reimbursement amount for each CPT code." Dep. of Michael Rupert (ECF No. 62-17) at 14:22–15:5.

[34]   Defs.' SUMF ¶ 68, at 13; Pl.'s Resp. ¶ 68, at 12.

Three further meetings with Dr. Barot and administrators for Defendants were held on June 11, 2010, July 13, 2010, and August 4, 2010.[35][36]  On November 2, 2010, SHS, through Vice President of Operations and Administrator of Divine Providence Hospital Ronald J. Reynolds, sent Dr. Barot a letter notifying him of their intent to terminate his appointment as Medical Director of the Gastroenterology Program effective January 31, 2011.[37]  Dr. Barot's separate Physician Employment Agreement with SPS/SHMG was unaffected, and he remained as one of two gastroenterologists working for SPS/SHMG.[38]

On December 2, 2010, Mr. Turri sent to Dr. Barot a Memo concerning "incentive compensation due at the end of the first contract year (July 2010)."[39] This Memo relayed the following information: (1) the 2010 90th MGMA percentile for his practice group, (2) the amount of incentive compensation that he would automatically be paid up to the 90th percentile, and (3) the amount of incentive

---

[35]  Dep. of Navin Barot (ECF No. 66-1), Exh. 4-F (June 11, 2010 Practice Review); Dep. of Navin Barot (ECF No. 66-1), Exh. 4-I (July 13, 2010 Gastroenterology Medical Director Meeting); Dep. of Navin Barot (ECF No. 66-1), Exh. 4-J (August 4, 2010).

[36]  While the minutes of these meetings reflect discussions over Dr. Barot's performance as medical director, Dr. Barot denies that his performance as medical director was unsatisfactory. Pl.'s Resp. ¶ 69, at 13.  However, as explained more fully below, this dispute as to whether his performance as medical director was unsatisfactory does not preclude summary judgment as the plain language of the medical director contract stipulated **at will retention**. *See* Susquehanna Health System Medical Director of the Gastroenterology Program Agreement (ECF No. 66-1), Exh. 4-A.

[37]  Dep. of Ronald Reynolds (ECF No. 66-5), Exh. 8-A.

[38]  Dep. of William C. McCauley, M.D. (ECF No. 65-4), at 74:6-9.

[39]  Dep. of Jim Turri (ECF No. 65-3), Exh. 2-F (December 2, 2010 Memo).

compensation that would go to the Compensation Committee for approval to pay above the 90th percentile in accordance with the terms of the Employment Agreement.[40]  Specifically, this December 2, 2010 Memo detailed that, while Dr. Barot was entitled to (and was automatically paid) incentive compensation of $216,747 (up to the 90th percentile of $777,340), the balance ($160,560) would be the Physician Compensation Committee for approval.[41]  A later email from Mr. Turri to Dr. Barot indicates that he had asked Kenneth Young, Vice President of Legal Services for SHS his opinion regarding whether Dr. Barot should receive RVU credit for conscious sedation when included within other medical services.[42] Mr. Turri further wrote:

> In the mean time I have attached the documentation from the 2010 CPT book Appendix H which is a summary of CPT codes that include moderate (conscious) sedation. This is what I am basing our interpretation on and you can read for yourself what it states:

> "Since these services include moderate sedation, it is not appropriate for the same physician to report both the service and the sedation codes 99143-99145. It is expected to that if conscious sedation is provided to the patient as part of one of those service(sic), it is provided by the same physician who is providing the service."[43]

Thereafter, on March 7, 2011, Dr. Barot sent Steven Johnson, CEO of Susquehanna Health System, a Notice of Material Breach of his Physician

---

[40]  *Id.*

[41]  *Id.*

[42]  Dep. of Jim Turri (ECF No. 65-3), Exh. 2-G.

[43]  *Id.*

Employment Agreement and (90) day Notice to Terminate Employment.[44]  While this Notice detailed as areas of breach both the failure to include within Dr. Barot's RVU calculation moderate conscious sedation amounts under CPT codes 99144 and 99145 and failure to present the request to the Compensation Committee, it omitted any reference to an alleged failure by Defendants to include him in the interview process for subordinates or to allow him to attend a CME.[45]  Two days later, on March 9, 2011, Dr. Barot, through his attorney, sent a second letter to Defendants rescinding the March 7, 2011 notice of breach.[46]  The Compensation Committee then met on March 10, 2011, and approved incentive compensation for the plaintiff above the 90th percentile in the amount of $160,559.73.[47]

Dr. Barot, through his counsel, then sent a second letter to Defendants on April 15, 2011 again notifying them of a claim of breach, and a thirty day notice of intent to terminate.[48]  This Notice detailed as an area of breach the failure to include within Dr. Barot's RVU calculation moderate (conscious) sedation amounts under CPT codes 99144 and 99145, and for the first time included allegations that he was the subject of illegal discrimination.[49]  Lacking again was

---

[44]   Dep. of Navin Barot (ECF No. 66-1), Exh. 4-V.

[45]   *Id.*

[46]   Dep. of Navin Barot (ECF No. 66-1), Exh. 4-W.

[47]   Dep. of Steve Johnson (ECF No. 66-2), Exh. 1-D.

[48]   Dep. of Navin Barot (ECF No. 66-1), Exh. 4-Y.

[49]   *Id.*

any reference to an alleged failure by Defendants to include him in the interview process for subordinates or to allow him to attend a CME.[50]

Following this Notice of Breach and Termination, on May 2, 2011, Brian Buttorff sent a memo to Dr. Barot regarding a recent request for PTO and CME time off.[51] This May 2, 2011 memo denied Dr. Barot's request to attend a CME, noting, *inter alia*:

> You are leaving the medical group with only a thirty day notice and we will need coverage during the last two weeks of your notice. You have not provided any specific information on what conference you plan on attending with enough notice for our serious consideration.[52]

Dr. Barot thereafter responded in an email later that date providing details of the CME scheduled for May 7-10, 2011.[53] Mr. Buttorff, via email of May 3, 2011, approved Dr. Barot's request to attend the CME on May 7-10, 2011.[54]

On May 12, 2011, the Compensation Committee again met to discuss Dr. Barot's request for compensation in excess of the 90th percentile for RVU credit for the additional codes for conscious sedation.[55] Meeting Minutes from this

---

[50] *Id.*; Pl. Resp. ¶ 137, at 22.

[51] Defs.' SUMF ¶ 138, at 26; Pl.'s Resp. ¶ 138, at 22.

[52] Dep. of Brian Buttorff (ECF No. 66-4), Exh. 7-B (May 2, 2011 Memo from Brian Buttorff to Navin Barot).

[53] *Id.* (May 2, 2011 Email from Dr. Barot to Brian Buttorff).

[54] *Id.* (May 3, 2011 Email from Brian Buttorff to Navin Barot).

[55] Dep. of Jim Turri (ECF No. 65-3), Exh. 2-H (May 12, 2011 SHMG Physician Compensation Committee Meeting Minutes).

Compensation Committee meeting demonstrate Mr. Turri made a presentation

which included a detailed two page report and attachments[56] from SHS's legal

counsel.[57]  The Report entitled "Physician Compensation Exceptions: Moderate

Conscious Sedation RVU Credit Issue" included the following guidance:

> The following outlines the key facts to be considered in this review:
>
> > a) Dr. Barot administers moderate (conscious) sedation (IVCS) when doing endoscopy studies. The codes that are in question are 99143-99145.
> >
> > b) Dr. Barot feels he should receive credit for all IVCS WRVU's as per the attachment on his contract (see Attachment 1, page 2) regardless of the CMS policy that clearly states those codes cannot be billed for separately by the same physician performing the procedure as they are included in the procedure codes. The e-mail from Mr. Turri to Dr. Barot (Attachment 1, page 1) dated May 13, 2009 (prior to Dr. Barot's commitment to join SHMG) refers to commonly used GI procedures and RVU values and also explains that details need to be worked out for RVU values based on how to bill and how SHMG would be paid for them.
> >
> > c) After completion of his first year Dr. Barot was paid an incentive according to his contract terms of $216,747 which brought him to the 90th percentile. Dr. Barot requested additional payment and credit for the IVCS included in procedures he performed. SHMG took the position that no additional credit was due as per CMS.

---

[56]  Included in the attachments is a December 8, 2010 email from Kenneth Young, Esquire, Vice President of Legal Services for SHS to Mr. Turri, which appears to be in response to Dr. Barot's questions concerning the December 2, 2010 Memo concerning incentive compensation for the contract year. *See* Dep. of Jim Turri (ECF No. 65-3), Exh. 2-H, Attachment 3.  In this email, Mr. Young explains that RVUs associated with two different codes cannot be counted if Medicare provides that only one of those codes is reimburseable, and the other is bundled into the billable code. *Id.*

[57]  *Id.*

According to CMS and as documented in the 2010 CPT code book, the endoscopy services provided by Dr. Barot in question "include moderate sedation and it is not appropriate for the same physician to report both the service and the sedation codes 99143-99145. It is expected that if conscious sedation is provided to the patient as part of one of these services, it is provided by the same physician who is providing the service". (See Attachment 2).

d) Management's interpretation of this and the reason additional IVCS WRVU credit was not provided for these endoscopy procedures is the credit is already included within the procedural code performed, documented and paid for accordingly.

e) According to SH Legal services: "for an RVU to be "counted", it must be for a service reimbursable by Medicare. You can't count the RVU's associated with two different codes if Medicare provides that only one of those codes is reimbursable, and the other must be bundled into the billable code, which would result in a multiplier effect" (See related correspondence Attachment 3).[58]

The Compensation Committee thereafter reached the following factual conclusions:

- There have been a number of reported problems and performance issues with Dr. Barot's practice style including very low patient satisfaction scores and many referring physician complaints. Dr. Barot's work volume trend has been declining as a result.

- This Committee has determined that Dr. Barot's total compensation would exceed fair market value if any additional compensation payments were made which is contrary to the obligation of a non-profit tax-exempt organization.

---

[58] *Id.*

- According to the document provided by Mr. Turri, paying the additional compensation requested by Dr. Barot would be a ratio at least 1.41 times higher than the MGMA 90th percentile. A ratio of this magnitude is not even reported by the MGMA survey.[59]

Attorney Ann Pepperman, a member of the Compensation Committee, made a motion to deny the request for additional compensation because (1) Dr. Barot's productivity and overall performance does not justify paying a ratio that much higher over the 90th percentile of the MGMA compensation survey, and (2) this level of compensation would exceed the amount considered reasonable by a tax exempt organization.[60] The motion thereafter received unanimous approval.[61] This decision of the Compensation Committee was relayed to Dr. Barot in a letter from Mr. Turri, dated May 31, 2011.[62]

## III. LAW

"One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose."[63] Summary judgment is appropriate where "the movant shows that there is no genuine dispute

---

[59] *Id.*

[60] *Id.*

[61] *Id.*

[62] Dep. of Navin Barot (ECF No. 66-1), Exh. 4-AA.

[63] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

as to any material fact and the movant is entitled to judgment as a matter of law."[64]

"Facts that could alter the outcome are 'material facts,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."[65] "A defendant meets this standard when there is an absence of evidence that rationally supports the plaintiff's case."[66] "A plaintiff, on the other hand, must point to admissible evidence that would be sufficient to show all elements of a *prima facie* case under applicable substantive law."[67]

"[T]he inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits."[68] Thus, "[i]f the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence

---

[64]   Fed. R. Civ. P. 56(a).

[65]   *Clark v. Modern Grp. Ltd.*, 9 F.3d 321, 326 (3d Cir. 1993) (Hutchinson, J.) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) and *Celotex Corp.*, 477 U.S. at 322).

[66]   *Clark*, 9 F.3d at 326.

[67]   *Id.*

[68]   *Liberty Lobby, Inc.*, 477 U.S. at 252.

presented."[69]  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."[70]  "The judge's inquiry, therefore, unavoidably asks . . . 'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.'"[71]  Summary judgment therefore is "where the rubber meets the road" for a plaintiff, as the evidentiary record at trial, by rule, will typically never surpass that which was compiled during the course of discovery.

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."[72]  "[R]egardless of whether the moving party accompanies its summary judgment motion with affidavits, the motion may, and should, be granted so long as whatever is before the district court

---

[69]  *Id.*

[70]  *Id.*

[71]  *Id.* (quoting *Schuylkill & Dauphin Imp. Co. v. Munson*, 81 U.S. 442, 447 (1871)).

[72]  *Celotex Corp.*, 477 U.S. at 323 (internal quotations omitted).

demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied."[73]

Where the movant properly supports his motion, the nonmoving party, to avoid summary judgment, must answer by setting forth "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."[74]  For movants and nonmovants alike, the assertion "that a fact cannot be or is genuinely disputed" must be supported by: (i) "citing to particular parts of materials in the record" that go beyond "mere allegations"; (ii) "showing that the materials cited do not establish the absence or presence of a genuine dispute"; or (iii) "showing . . . that an adverse party cannot produce admissible evidence to support the fact."[75]

"When opposing summary judgment, the non-movant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'"[76]  Moreover, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact

---

[73] *Id.*

[74] *Liberty Lobby, Inc.*, 477 U.S. at 250.

[75] Fed. R. Civ. P. 56(c)(1).

[76] *Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 233 (3d Cir. 2003) (Weis, J.).

undisputed for purposes of the motion."[77]  On motion for summary judgment, "[t]he court need consider only the cited materials, but it may consider other materials in the record."[78]

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."[79]  "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."[80]  "If the evidence is merely colorable . . . or is not significantly probative, summary judgment may be granted."[81]

Finally, when presented with cross-motions for summary judgment, such as here, a district court should consider the motions separately and apply the appropriate burden of production to each motion.[82]

## IV.    ANALYSIS

Count V, or breach of contract, is the sole remaining claim within Dr. Barot's Complaint.  Under Pennsylvania law, the three elements of a breach of contract claim are: (1) the existence of a contract, including its essential terms; (2)

---

[77]  Fed. R. Civ. P. 56(e)(2).

[78]  Fed. R. Civ. P. 56(c)(3).

[79]  *Liberty Lobby, Inc.*, 477 U.S. at 249.

[80]  *Id.*

[81]  *Id.* at 249–50 (internal citations omitted).

[82]  *See Lawrence v. City of Philadelphia*, 527 F.3d 299, 310 (3d Cir. 2008).

a breach of a duty imposed by that contract; and (3) resultant damages.[83]  Here,

there is no dispute that two contracts exist between the parties, and, to the extent

there is breach, Dr. Barot has established resultant damages.  The dispute therefore

centers on whether Defendants have breached the language of the two operative

employment-related contracts.

Dr. Barot specifically alleges that Defendants have breached both (1) his

"Physician Employment Agreement" with Defendants Susquehanna Physician

Services d/b/a Susquehanna Health Medical Group, and (2) his "Medical Director

of the Gastroenterology Program" contract with Susquehanna Health Services, as

contracting agent for Divine Providence Hospital of the Sisters of Christian

Charity, and Susquehanna Physician Services.  In supporting of this contractual

claim, Dr. Barot alleges Defendants breached their obligations through the

following conduct: (1) refusing to allow Dr. Barot to attend continuing education;

(2) refusing to allow Dr. Barot the opportunity to interview and hire candidates that

would work for him; (3) refusing to properly compensate Dr. Barot for his RVU's

and incentive compensation; (4) improperly terminating Dr. Barot from his

position as Susquehanna Health System Medical Director of the Gastroenterology

Program; (5) discriminating against Dr. Barot on the basis of his race and national

---

[83]  *See CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa.Super. Ct. 1999).

origin; and (5) failing to pay Dr. Barot severance payments due under the terms of the Physician Employment Agreement.[84]

Defendants, in turn, move for summary judgment on Count V, arguing that there exist no genuine disputes as to material fact on this claim. In support of this contention, Defendants model their argument according to the above alleged breaches, methodically addressing and dispelling each instance in accordance with the relevant contractual language. My analysis of Defendant's Motion will largely follow that organization.

### A. Breach of the Physician Employment Agreement Predicated on Defendants' Claims Regarding Continuing Education and Staff Decisions

Defendants first move for summary judgment on Dr. Barot's breach of contract claim to the extent it is based on their alleged refusal to allow him to attend continuing education courses or to participate in the interview of employees working for him. Defendants specifically aver that Dr. Barot has not adduced evidence to support these allegations, and, even assuming the veracity of these allegations, they do not amount to a material breach of the contract. I agree with Defendants that, to the extent Dr. Barot's breach of contract claim is based on this conduct, no reasonable jury could find in his favor and the claim therefore fails as a matter of law.

---

[84] Compl. (ECF No. 1) ¶ 58, at 14.

This theory of breach of contract fails for lack of supporting evidence. As previously noted, the Physician Employment Agreement provided Dr. Barot "the opportunity to attend continuing medical education programs for a maximum of ten (10) business days annually."[85] Here, the factual record contains one instance following his final notice of termination which supports Dr. Barot's contention that his request to attend a CME was denied.[86] The record reflects, however, Dr. Barot later being given the opportunity to attend this CME held on May 7-10, 2011.[87] There is a paucity of any further evidence supporting his Dr. Barot's conclusory claim that he was denied the opportunity to attend a CME. Therefore, because mere conclusory allegations and self-serving testimony cannot be used to avoid summary judgment when uncorroborated and contradicted by other evidence of record, this allegation of breach is insufficient for presentation to a jury.[88]

Second, there is also a lack of any factual support for Dr. Barot's claim that he was denied the opportunity to interview candidates working for him. Specifically, in his deposition, Dr. Barot fails to identify with specificity instances

---

[85]  *Id.* ¶ 11.

[86]  Dep. of Navin Barot (ECF No. 66-1) at 113:21—114:9.

[87]  Dep. of Brian Buttorff (ECF No. 66-4), Exhibit 7-B.

[88]  *Thomas v. Delaware State Univ.*, 626 Fed.Appx. 384, 389 n.6 (3d Cir. 2015) (non-precedential) ("[U]nsupported deposition testimony, which is contradicted by the record, is insufficient to defeat summary judgment."); *Nat'l Labor Rel. Bd. v. FES*, 301 F.3d 83, 95 (3d Cir. 2002) ("[The plaintiff's] testimony . . . amounts to an unsupported, conclusory assertion, which we have held is inadequate to satisfy the movant's burden of proof on summary judgment.").

where he was denied the opportunity to interview support personnel.[89]  Dr. Barot

instead cites Defendants' failure to include him in the interview process of his

successor as Medical Director—Dr. Schaefer.[90]  The plain language of Section 13,

however, stipulates that "SHMG and Physician agree to jointly participate in the

interview, selection, and performance appraisal of **all such support personnel**."[91]

Dr. Schaefer, at best a professional of equal status, fails to fit the criterion of

"support personnel."

Third and finally, Dr. Barot's breach of contract claim premised on these

alleged breaches fails for lack of compliance with Section 20 of the Physician

Employment Agreement, governing "Termination."  That Section states the

following:

> In the event of a material breach of this Agreement by either party, the non-breaching party shall give the breaching party written notice specifying the default along with notice to terminate within thirty (30) days. The breaching party shall have thirty (30) days within which to cure the default. If such a default is not cured within that time, this Agreement shall terminate.[92]

Here, even assuming that the above failures concerning CMEs and staffing

constitute material breaches, the factual record contains no evidence that Dr. Barot

informed Defendants and provided them an opportunity to cure these breaches in

---

[89]  Dep. of Navin Barot (ECF No. 66-1) at 119:2-9.

[90]  *Id.* at 120:1-4.

[91]  Physician Employment Agreement (ECF No. 1-1) ¶ 13, at 8 (emphasis added).

[92]  *Id.* ¶ 19, at 11–12.

accord with the plain language of his Physician Employment Agreement.  Indeed,

neither the March 7, 2011 nor the April 15, 2011 notices of termination contain

any mention of CME or staffing breaches by Defendants.[93]  Therefore, based on

the above sufficient and legally independent reasons, Dr. Barot's breach of contract

claim fails to the extent based on these grounds.

### B. Breach of the Physician Employment Agreement Predicated on Defendants' Failure to Compensate Dr. Barot in Accordance with the Incentive Compensation Provision

Defendants next move for summary judgment on Dr. Barot's breach of

contract claim to the extent it is based on a failure to fully compensate him in

accordance with the incentive provisions of his Physician Employment Agreement.

As noted above, the Incentive Compensation provision of the Physician

Employment Agreement specifically states the following:

> In order to promote the efficient operation of Physician's medical practice and the availability and provision of high quality medical service to the community served by SHMG, Physician shall be eligible to participate in an incentive compensation program in the first three years of the Agreement. If Physicians WRVU's at the end of the contract year exceed 10,000 WRVU's, physician shall receive Additional Compensation, subject to the limitations set forth in Section 7 below . . . [94]

---

[93] *See* Dep. of  Navin Barot (ECF No. 66-1), Exh. 4-V; Dep. of Navin Barot (ECF No. 66-1), Exh. 4-Y.

[94] Susquehanna Health Medical Group Physician Employment Agreement (ECF No. 1-1), at 3.

Section 7 of the Physician Employment Agreement, referenced in the above

passage as a limitation on allowable incentive compensation, further provides the

following:

> The total amount of Base Salary plus Incentive and Quality Bonus
> Compensation payable by SHMG to Physician in any year of this
> Agreement shall not exceed the 90th percentile of the most recently
> available comparable Compensation Survey published by the Medical
> Group Management Association for physicians in the same specialty
> as Physician. If Physician's productivity, expertise and overall job
> performance suggests that his compensation should exceed the 90th
> percentile compensation limitation set forth herein, it will be
> presented to the Compensation Committee of the SHMG Board of
> Directors for consideration and a determination  in accordance with
> SHMG policy and procedure. However, Physician's total
> compensation shall not exceed such amount as would constitute
> reasonable compensation when paid by an organization, such as
> SHMG, which is a tax-exempt organization under Section 501 (c)(3)
> of the Code.[95]

Defendants aver that the undisputed factual record of this case demonstrates that

they exercised the discretion afforded by Section 7 in good faith as required by

contractual principles through the presentation of Dr. Barot's requests to the

Physician Compensation Committee, and the Committee's subsequent decision in

accordance with allowable considerations.

Dr. Barot, however, disputes the extent of discretion which the contractual

provisions of the Physician Employee Agreement afforded, and argues that

Defendants reached their denial of additional compensation based on improper

---

[95] *Id.* at 4–5.

considerations. He argues instead that promises made to induce him to work for SPS/SHMG established Committee procedure in that if he was doing the work, he would get paid so long as such payment would not violate the Internal Revenue Code.[96] Dr. Barot therefore contests what he terms Defendants' argument in favor of "unfettered discretion."[97] He specifically avers that consideration of "physician compliance audits, physician performance and referrals, or a physician's reputation, behavior or staff turnover" by Defendants' Compensation Committee at its May 12, 2011 meeting was an improper exercise of discretion, and that such consideration was instead simply a "condition precedent" to presentation to the committee.[98] Furthermore, while the Compensation Committee stated that the compensation sought was not reasonable when paid by a tax-exempt organization

---

[96] Pl.'s Br. at 9.

[97] Introduction of this parol evidence, however, necessarily requires a finding that the Physician Employment Agreement was not fully integrated, or was patently or latently ambiguous. As a matter of law, it was neither. First, I note that, given the presence of Section 26's integration clause, the Physician Employment Agreement was a fully integrated document. *See Yocca v. Pittsburgh Steelers Sports, Inc.*, 854 A.2d 425, 436 (Pa. 2004)("An integration clause which states that a writing is meant to represent the parties' entire agreement is also a clear sign that the writing is meant to be just that and thereby expresses all of the parties' negotiations, conversations, and agreements made prior to its execution."). Second, the extent that Dr. Barot is trying to establish an ambiguity, and that effort is unclear, I note that the terms "policy" and "procedure" are not patently ambiguous as they directly refer to the "Susquehanna Health Medical Employed Physician Compensation" Policy—a citation Dr. Barot directly makes. *See* Pl.'s Br. at 9–10. Second, the proffered evidence by Dr. Barot is not sufficient to establish a latent ambiguity as it fails to address "the parties' objectively manifested 'linguistic reference' regarding the terms of the contract" and instead simply supports Dr. Barot's expectations concerning the contract. *Bohler-Uddeholm America, Inc. v. Ellwood Group, Inc.*, 247 F.3d 79, 93 n.3 (3d Cir. 2001) ("Evidence regarding a party's beliefs about the general ramifications of the contract would not be the right type to establish latent ambiguity.").

[98] Pl.'s Br. at 9–10.

such as SPS/SHMG, Dr. Barot counters that the Compensation Committee incorrectly found this limitation.[99]

Section 205 of the Restatement (Second) of Contracts provides: "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement."[100] Our Court of Appeals has noted however that, while every contract in Pennsylvania imposes upon each party an implied duty of good faith, that duty is "not limitless," and "there must be some relationship to the provisions of the contract itself to invoke the duty of good faith."[101] "A breach of the implied duty of good faith is, therefore, a breach of the contract between the parties. Whether a party failed to exercise good faith in its performance of the contract is a fact-based inquiry."[102] While the Pennsylvania Superior Court has noted that a complete catalogue of types of bad faith is impossible, certain "strains" of bad faith repeat.[103] These examples include:

> evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to

---

[99] *Id.* at 11.

[100] RESTATEMENT (SECOND) CONTRACTS § 205 (quoted by *W. Run Student Hous. Assocs., LLC v. Huntington Nat'l Bank*, 712 F.3d 165, 170 (3d Cir. 2013)).

[101] *W. Run Student Hous.*, 712 F.3d at 170.

[102] *Haywood v. University of Pittsburgh*, 976 F.Supp.2d 606, 627 (W.D.Pa. 2013).

[103] *Stamerro v. Stamerro*, 889 A.2d 1251, 1259 (Pa. Super. Ct. 2005)(citing *Somers v. Somers*, 613 A.2d 1211, 1213 (1992)).

specify terms, and interference with or failure to cooperate in the other party's performance.[104]

Importantly, for purposes of the instant motion, " '[t]he covenant of good faith may also be breached when a party exercises discretion authorized in a contract in an unreasonable way.' "[105]

At its May 12, 2011 meeting, the Compensation Committee found that Dr. Barot's request for additional compensation was "unreasonable" because:

- There have been a number of reported problems and performance issues with Dr. Barot's practice style including very low patient satisfaction scores and many referring physician complaints. Dr. Barot's work volume trend has been declining as a result.

- This Committee has determined that Dr. Barot's total compensation would exceed fair market value if any additional compensation payments were made which is contrary to the obligation of a non-profit tax-exempt organization.

- According to the document provided by Mr. Turri, paying the additional compensation requested by Dr. Barot would be a ratio at least 1.41 times higher than the MOMA 90th percentile. A ratio of this magnitude is not even reported by the MGMA survey.[106]

Given the discretionary language of Section 7 of the Physician Employment Agreement governing incentive compensation and having considered the parties' arguments carefully in light of the factual record, I find that no evidence exists

---

[104] *Id.*

[105] *Montanez v. HSBC Mortg. Corp.*, 876 F.Supp.2d 504, 513 (E.D.Pa. 2012) (quoting *Phila. Plaza–Phase II v. Bank of Am. Nat'l Trust & Savs. Assoc.*, No. 3745 April Term 2002, 2002 WL 1472337, at *6 (Pa.Ct.C.P.Phila.Cnty. June 21, 2002)).

[106] *Id.* at 13 (citing SHMG Physician Compensation Committee May 12,2011 Meeting Minutes (ECF No. 62-25)).

from which a reasonable jury could conclude Defendants exercised their discretion in bad faith. My reasoning is as follows.

First, while Dr. Barot essentially argues that the Compensation Committee acted in bad faith by not awarding RVU credit for moderate (conscious) sedation CPT codes 99144 and 99145. That argument of bad faith is, however, dispelled by the factual record. Indeed, long a point of contention between the parties, the Minutes of the May 12, 2011 Compensation Committee meeting indicate that Mr. Turri presented to the Compensation Committee Dr. Barot's argument that he should be credited for these conscious (moderate) sedation codes in accord with an attachment to his Physician Employment Agreement listing these codes, regardless of whether bundled into another procedure.[107] In the Report provided by Mr. Turri and attached to the meeting minutes, providing credit for said codes when performed in the context of another medical procedure is, however, described as in contravention of Centers for Medicare and Medicaid Services (CMS) policy.[108] That CMS policy, attached to the report as Attachment 2, contains a list of CPT codes that include Moderate (Conscious) Sedation and states the following:

> The following list of procedures includes conscious sedation as an inherent part of providing the procedure. These codes are identified in the CPT codebook with a symbol.

---

[107] *See* Dep. of Jim Turri (ECF No. 65-3), Exh. 2-H, Attachment 3.

[108] *Id.*

Since these services include moderate sedation, **it is not appropriate for the same physician to report both the service and the sedation codes 99143-99145**. It is expected that if conscious sedation is provided to the patient as part of one of these services, it is provided by the same physician who is providing the service.[109]

The Report provided by Mr. Turri advises that, because the endoscopy services performed by Dr. Barot include moderate sedation, he cannot report both the service and the sedation codes 99143-99145.[110] Minutes from the Committee meeting subsequently indicate "comprehensive review and discussion" of the Report.[111]

Finally, even if the Compensation Committee erroneously accepted the Report's conclusion concerning the moderate (conscious) sedation codes, the factual record reflects that the Committee nevertheless found, based on Dr. Barot's performance, that his "total compensation would exceed fair market value if **any** additional compensation were made which is contrary to the obligation of a non-profit tax-exempt organization."[112][113] While Dr. Barot argues that the Compensation Committee incorrectly found that any additional compensation

---

[109] *See* Dep. of Jim Turri (ECF No. 65-3), Exh. 2-H, Attachment 2.

[110] *See* Dep. of Jim Turri (ECF No. 65-3), Exh. 2-H, Attachment 2.

[111] *Id.*

[112] *See* Dep. of Jim Turri (ECF No. 65-3), Exh. 2-H (emphasis added).

[113] Reasonable Compensation is defined in the "Susquehanna Health Medical Group Employed Physician Compensation" policy as "compensation for services such as would ordinarily be paid based upon an arm's length, fair market value transaction for similar services by similar organizations within the relevant  geographic market at the date the contract for services is made." *See* Dep. of Steven Johnson (ECF No. 65-2), Exh. 1-A, "Susquehanna Health Medical Group Employed Physician Compensation" policy ¶ 6, at 2.

would be in violation of the Stark Regulations, Anti-Kickback Statute, and Internal

Revenue Code, the factual record does not contain evidence of a bad faith or

unreasonable consideration of these factors. Indeed, in reaching the conclusion

that the requested compensation would result in a ratio of "1.41 times higher than

the MGMA 90th percentile," the Committee relied on the advice of counsel

pertaining to the legal issues presented. In the deposition of Compensation

Committee member Ann Pepperman, she explained the process as follows:

> Q. Like we're going to have a two-hour class and this is what the
> Compensation Committee is about and this how we operate, things
> like that?
>
> A. Not that—let me put it this way. We have education, not
> necessarily a, quote, training program. But we have education at each
> of the meetings where whatever the issue is, we're provided additional
> information relating to that issue.[114]

In the particular circumstance of IRS regulations, Ms. Pepperman stated as

follows:

> Q. Are you aware of anything particular with respect to the IRS that
> would limit a certain percentile or a certain amount above?
>
> A. It has to be fair market value. That's all I can say. Compensation
> has to be fair market value.
>
> . . .
>
> Q. What's your understanding of what that means, fair market value?

---

[114] Dep. of Ann Pepperman (ECF No. 66-7) at 9:3-10.

A. I think it depends on the circumstances but what I would use would be information from management and then what counsel's advice would be based on counsel's explanation of what the law may be.[115]

In this matter, the factual record lacks any evidence from which a reasonable jury could find that Defendants, through their Physician Compensation Committee, breached the Physician Employment Agreement by exercising the discretion afforded to them in bad faith or in an unreasonable manner, as contemplated by Pennsylvania courts. Specifically, while Dr. Barot is correct that the Compensation Committee was not afforded unfettered discretion, the minutes from the meeting in question contain no evidence of an improper consideration not contemplated by the Physician Employment Agreement. Therefore, to the extent Dr. Barot's breach of contract claim, or Count V, is based on breach of the Incentive Compensation provision, summary judgment is hereby granted.

> **C.** **Breach of the Medical Director of the Gastroenterology Program Agreement Predicated on Dr. Barot's Termination from his position as Susquehanna Health System Medical Director of the Gastroenterology Program**

Defendants next move for summary judgment on Count V to the extent it is based on Dr. Barot's termination as Medical Director of the Gastroenterology Program. Finding no genuine dispute of material fact demonstrating a breach of the terms of his Medical Director contract, summary judgment will also be granted on this theory.

_____

[115] *Id.* at 33:25—34:13; 35:6-12.

First, as with Dr. Barot's contentions concerning CMEs and staffing, I note he has again failed to oppose the imposition of summary judgment on this theory of breach contract and can be deemed to have abandoned its advancement.[116] Second, even reaching the merits of this theory, Dr. Barot's Medical Director Contract states that the agreement will "terminable at will by either party upon services of written notification of intent to terminate not fewer than ninety (90) days prior to the effective date of termination."[117] Here, the undisputed facts indicate that said notice was provided. Specifically, on November 2, 2010, Defendants, acting through Vice President of Operations Ronald J. Reynolds, sent Dr. Barot a written notice of his termination as Medical Director effective January 31, 2011.[118] Therefore, while Dr. Barot believed that he could only be terminable "for cause,"[119] that belief is belied by the plain language of Medical Director Contract, and incapable of altering that language by the contract's integration

---

[116] *Bowser v. Bogdanovic*, Civil Action No. 08-CV-847, 2010 WL 1462548 (M.D. Pa. Apr. 9, 2010) ("[W]hen the moving party argues that summary judgment should be granted in its favor regarding a certain claim, the non-movant abandons that claim by failing to address it in his response to the motion for summary judgment.") (citing *Seals v. City of Lancaster*, 553 F.Supp.2d 427, 432-33 (E.D. Pa. 2008)). The closest Dr. Barot comes to addressing this issue is at page 3 of his brief in opposition where he contests Defendants' assertion that he did not submit forms substantiating his work as Medical Director. *See* Pl.'s Br. at 3. He fails, however, to address the consequence of this fact given the at-will nature of his employment as medical director.

[117] Medical Director Contract (ECF No. 1-2) ¶ 7, at 4–5.

[118] Dep. of Ronald Reynolds (ECF No. 66-5), Exh. 8-A.

[119] Dep. of Navin Barot (ECF No. 66-1) at 98:12-19.

clause.[120]  Because no reasonable jury could find a breach of the Medical Director

Contract premised on this theory, summary judgment will be granted.

>    **D.    Breach of the Physician Employment Agreement Predicated**
>    **On Discriminating against Dr. Barot on the Basis of His**
>    **Race and National Origin and Defendants' Failure to Pay**
>    **Dr. Barot Severance Payment.**

Finally, Defendants move for summary judgment on Count V to the extent it

is premised on racial or national origin discrimination against Dr. Barot or their

alleged failure to make a severance payment to him in accord with paragraph 20 of

his employment agreement.  Finding no genuine dispute of material fact from

which a reasonable jury could find for Dr. Barot on these theories of breach,

summary judgment will be granted.

First, as noted above, Dr. Barot's complaint as originally filed contained five

claims, three of which included employment discrimination claims under Title VII,

the Pennsylvania Human Relations Act, and 42 U.S.C. § 1981.[121]  Following the

completion of discovery, the parties filed a Stipulation of Dismissal of these counts

on October 10, 2016.[122]  Dr. Barot, however, now attempts to premise his breach of

contract claim, or Count V, on alleged acts of discrimination.  This attempt is

---

[120]  Medical Director Contract (ECF No. 1-2) ¶ 9, at 5.

[121]  ECF No. 1.

[122]  ECF No. 56.

unavailing as a breach of contract claim premised on such discrimination is preempted by the Pennsylvania Human Relations Act.[123]

Moreover, although Dr. Barot now alleges that his Physician Employment Agreement was breached by racially discriminatory events,[124] his Notice of termination on April 15, 2011 instances the first time Defendants were informed of such a claim.[125] This Notice fails to further delineate this claim of discrimination,[126] nor does Dr. Barot further substantiate it in his deposition beyond merely tying perceived areas of contractual breach to his protected status. Indeed, while Dr. Barot alleges being told of both his different "culture" and the complaints of other Indian doctors, these perceptions are not substantiated by the factual record.[127] Rather, the only evidence of record on this issue, while substantiating mention of "culture," places this reference within the context of parties' difficulties with Dr. Barot as Medical Director and dispels any discriminatory notion. Specifically, Gastroenterology Director Meeting minutes from July 13, 2010 reflect the following:

---

[123] *See Keck v. Commercial Union Ins. Co.*, 758 F. Supp. 1034 (M.D.Pa. 1991)(finding that an employee's breach of contract claim, premised upon allegation that act of discrimination based upon nonjob related handicap, was preempted by the Pennsylvania Human Relations Act).

[124] *See* Pl.'s Br. at 14-15.

[125] *See* ECF No. 92-1 (April 21, 2011 Letter from Brian Bluth, Esquire, attorney for Defendants, to Christian A. Lovecchio, Esquire, attorney for Dr. Barot).

[126] *See* ECF No. 62-33 (April 15, 2011 Letter from Christian A. Lovecchio, Esquire, attorney for Dr. Barot to Brian Bluth, Esquire, attorney for Defendants).

[127] *See* Dep. of Navin Barot (ECF No. 66-1) at 174:7—176:3.

- 35 -

Dr. Manchester discussed the medical director contract citing the "at will" termination provision with 90 days notice.

. . .

Dr. Manchester noted that, in addition to objective measures of success with medical directorship, there are also subjective components such as "fit" and management culture that must work for the welfare of the community and SH.

Dr. Manchester states that so far this does not feel like a good fit and noted that Susquehanna Health is not required by any standards to maintain a medical directorship for Gastroenterology and must consider whether or not to continue this particular allocation of limited resources.[128]

No other evidence exists corroborating Dr. Barot's complaints of racial or national origin discrimination.[129] Therefore, because Dr. Barot's unsupported allegations are insufficient to create a genuine dispute of material fact on his breach of

---

[128] Dep. of Lori Beucler (ECF No. 66-3), Exh. 6-C.

[129] *See* Dep. of James Turri (ECF No. 65-3), at 135:7-20 (Q. Okay. I can take that back. Do you ever recall in your time working with Dr. Barot Dr. Barot making any comments to you regarding any feeling that he was being discriminated against in any way? A. No, never. Q. Do you remember Dr. Barot ever making any comments to you to the effect that is he not pale enough for his job? A. No. Q. Did anyone else ever tell you that Dr. Barot had said anything to them about him believing that he was being discriminated against? A. I don't recall that, no.); Dep. of Neil Armstrong (ECF No. 66-2) at 9:1-10 (Q. Did Dr. Barot ever make any comments to you that he felt like he was being discriminated against in any way with respect to his employment at Susquehanna Health? A. No. Q. Did you ever have any conversations with anyone else where those individuals indicated that Dr. Barot had said he was being discriminated against? A. No.); Dep. of Lori Beucler (ECF No. 66-3) at 67: 4-10 (Q. In your managerial position since you've arrived at Susquehanna Health or even now that you've moved over, have you ever received any complaints from any employees about what they would be complaining about discriminatory treatment on the basis of their race or nationality? A. Never.).

contract claim, I find that summary judgment is proper to the extent it is based on discriminatory animus.[130]

Finally, Dr. Barot's claim based on Section 20, or the "Severance" provision of the Physician Employment Agreement, similarly fails. That section states the following, in pertinent part:

> In the event SHMG terminates this Agreement "without cause", or in the event Physician terminates this Agreement for material breach by SHMG, SHMG agrees that it shall pay Physician a severance payment ("Severance Payment") equal to the monthly Base Salary paid by SHMG to Physician during the twelve (12) calendar months immediately preceding the month of Physician's termination from employment.[131]

Here, having previously found the absence of a material breach by Defendants, no obligation existed for Defendants to pay severance as requested by Dr. Barot. Summary Judgment on Count V, to the extent based on this provision, is therefore granted.

## V.     CONCLUSION

---

[130] *See Thomas v. Delaware State Univ.*, 626 Fed.Appx. 384, 389 n.6 (3d Cir. 2015) ("[U]nsupported deposition testimony, which is contradicted by the record, is insufficient to defeat summary judgment."); *Nat'l Labor Rel. Bd. v. FES*, 301 F.3d 83, 95 (3d Cir. 2002) ("[The plaintiff's] testimony ... amounts to an unsupported, conclusory assertion, which we have held is inadequate to satisfy the movant's burden of proof on summary judgment."); *Brooks v. Am. Broad. Cos., Inc.*, 999 F.2d 167, 172 (6th Cir. 1993)("[T]he district court [is] not required to accept unsupported, self-serving testimony as evidence sufficient to create a jury question."); *cf. Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.").

[131] Physician Employment Agreement (ECF No. 1-1) ¶ 20, at 12.

After drawing all reasonable inferences in favor of the non-moving party—Dr. Barot—and finding that no genuine dispute as to material fact remains, I will grant Defendants' Motion for Summary Judgment in its entirety on all premises. Plaintiff Dr. Barot's Motion for Partial Summary Judgment is denied.

The Clerk of Court is directed to enter judgment in favor of Defendants and to close this case.

An appropriate Order follows.


BY THE COURT:


_s/ Matthew W. Brann_
Matthew W. Brann
United States District Judge